UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------x
SHIRLEY SAENZ, individually and for her minor child "F.J.S-R.,"
and ELI SAMUEL FIGUEROA A/K/A ELI SAMUEL

                              Plaintiff,

                -against-

CITY of NEW YORK; COMMISSIONER RAYMOND KELLY;
Detective DONNAMARRIE MAZZA, Detective CHRISTOPHER
KAROLOWSKI, Detective TODD NAGROWSKI, Sergeant "JOHN"
BARTOLA, Detective DEBORAH R. HAWKINS, Detective JOHN
TAYLOR, Sergeant DONNA BARTOLDUS, Detective JOSEPH
FAILLA, Detective "JANE" KELLEY, Detective **DENNIS CHAN**,
Detective ANTHONY SPENCER, Lieutenant JAIME ORTIZ, Police
Officer MICHELLE CALABRO, Deputy Chief **RAYMOND FERRARI**
all in their individual and official capacities; ADMINISTRATION
FOR CHILDREN SERVICES; JOHN WALKER, THOMAS DUNBAR,
DUWAYNE BOYCE, CARLA LAWRENCE, HOWARD JOLSON,
VILMA SMITH and **ANDREA AVENT**, all in their individual and official
capacities, **RONALD RICHTER**, individually and  as Commissioner
of ACS, **JOHN MATTINGLY**, former ACS Commissioner, individually,
"**JOHN DOE POLICE OFFICER**", are meant to be police officers
employed by the New York City Police Department, whose names
and badge numbers are Unknown, in their individual and official
capacities and "**JOHN DOE ACS AGENTS**" are meant to be ACS agents
whose names are Unknown, in their individual and official capacities
                                    Defendants.
------------------------------------------------------------------------x

**SECOND AMENDED
COMPLAINT**

11-CV-3160
(JBW)(CLP

**JURY TRIAL
DEMANDED**

        Plaintiffs, through their attorney, **MUSTAPHA NDANUSA, ESQ.**, as and for their amended

complaint against the defendants herein allege:

## I. PRELIMINARY STATEMENT

        1.     This is a civil rights action brought by Plaintiffs Shirley Saenz individually and on

behalf of infant Plaintiff F.J.S-R and Plaintiff Eli Samuel, which seeks damages, declaratory and injunctive relief to redress for Defendants' violation, under color of state law or action, or the rights of the plaintiffs secured by the Civil Rights Act of 1871, 42 U.S.C. § 1983, the First, Fourth, Fifth, Sixth, Ninth and Fourteenth Amendments of the United States Constitution and/or the laws and Constitution of The State of New York. In addition this action also seeks, on behalf of custodial parents, to redress the ongoing policy of paroling custody to non-custodial parents, absent an emergency situation, court order or warrant, when the custodial parent is already challenging custody in Family Court.

## II. JURISDICTION AND VENUE

2.      This is a civil Rights Action seeking damages for the defendants' violations of plaintiffs' rights, privileges, and immunities under the United States Constitution, as amended and the Civil Rights Act of 1871, 42 U.S.C. § 1983 and 1988, Article 1 Section 12 of the New York Constitution, and New York State Common Law. Plaintiffs further invokes the pendent jurisdiction of this Court in accordance with 28 U.S.C. Sections 1331, 1343 (a)(3) and (4), and 1367(a). As some of the unlawful acts complained of herein occurred in the Borough of Brooklyn, County of Kings, City and State of New York which is within the Eastern District of New York, venue is properly within this District pursuant to 28 U.S.C. § 1391 (b) and (e)(2).

3.      Jurisdiction of this Court is proper under 42 U.S.C. § 1983.

4.      Plaintiff has fully complied with the administrative prerequisites to the filing of this action under state law by timely serving and filing a notice of Claim in compliance with General Municipal Law § 50.

2

5.      Defendant City did not demand the statutory 50-h hearing pursuant General Municipal Law § 50(e).  At least thirty days have elapsed since the service of the notice of claim, and adjustment or payment thereof has been neglected or refused.

6.      This action was commenced within one year and ninety days after the happening of the events upon which these claims arise.

### III. PARTIES

7.      Plaintiff  **SHIRLEY SAENZ** (hereinafter "mother" or "Plaintiff Saenz") is the mother of the infant F.J.S-R., at all times mentioned herein, are both residents of the Borough of Brooklyn, County of  Kings, City and State of New York.

8.      Plaintiff **ELI SAMUEL FIGUEROA A/K/A ELI SAMUEL** (hereinafter "Plaintiff Samuel"), at all times mentioned herein, is a resident of the Borough of  Manhattan, County of New York, City and State of New York.

9.      At all times hereinafter mentioned, defendant **CITY OF NEW YORK** (hereinafter "**CITY**"), was and still is a municipal corporation existing under and by virtue of the laws of the State of New York.

10.      At all times hereinafter mentioned, defendant **RAYMOND KELLY** (hereinafter "**KELLY**") is employed by defendant **CITY** as Commissioner of the New York City Police Department ("**NYPD**") and is being sued in his individual and official capacities.

11.      At all times hereinafter mentioned, defendant, **CITY**, employed persons as police officers and said persons were so employed as police officers by and through the **NYPD**.

12.      Defendants **CITY** and **KELLY** were responsible for the training and supervision of police personnel and were also responsible for enforcing the regulations and policies of the New

3

York City Police Department and for ensuring that New York City Police Department employees obey, employ and implement regulations and policies, including policies regarding interference with ongoing custody proceedings and the detention of children whose caretakers have been arrested.

13.    At all times hereinafter mentioned, defendants, their agents, assistants and employees acted pursuant to the policies, regulations or decisions officially adopted or promulgated by agents of defendants, whose acts may fairly be said to represent official policy or governmental custom of the defendants **CITY** and **KELLY.**

14.    That upon information and belief Defendant Detective **DONNAMARIE MAZZA** (hereinafter "**MAZZA**") was employed by **CITY** as an NYPD officer in June of 2010 as a Detective.

15.    That upon information and belief Defendant Detective **CHRISTOPHER KAROLOWSKI** (hereinafter "**KAROLOWSK**I") was employed by **CITY** as an NYPD officer in June of 2010 as a Detective.

16.    That upon information and belief Defendant **TODD NAGROWSKI** (hereinafter "**NAGROWSKI**") was employed by **CITY** as an NYPD officer in June of 2010 as a Detective at the 72nd precinct.

17.    That upon information and belief Defendant **FNU BARTOLA** (hereinafter "**BARTOLA**") was employed by **CITY** as an NYPD officer in June of 2010 as a Sergeant at the Major Case Squad ("MCS").

18.    That upon information and belief Defendant **DEBORAH HAWKINS** (hereinafter "**HAWKINS**") was employed by **CITY** as an NYPD officer at Brooklyn Child Advocacy Center ("BCAC") in June of 2010 as a detective.

19.    That upon information and belief Defendant **JOHN TAYLOR** (hereinafter

4

"**TAYLOR**") was employed by **CITY** as an NYPD officer at BCAC in June of 2010 as a detective.

20.    That upon information and belief Defendant **DONNA BARTOLDUS** (hereinafter "**BARTOLDUS**") was employed by **CITY** as an NYPD officer at BCAC in June of 2010 as a sergeant.

21.    That upon information and belief Defendant **JOSEPH FAILLA** (hereinafter "**FAILLA**") was employed by **CITY** as an NYPD officer in June of 2010 as a detective at MCS.

22.    That upon information and belief Defendant **FNU KELLEY** (hereinafter "**KELLEY**") was employed by **CITY** as an NYPD officer in June of 2010 as a detective.

23.    That upon information and belief Defendant **ANTHONY SPENCER** (hereinafter "**SPENCER**") was employed by **CITY** as an NYPD officer in June of 2010 as a detective at the 72nd precinct.

24.    That upon information and belief Defendant **MICHELLE CALABRO** (hereinafter "**CALABRO**") was employed by **CITY** as an NYPD at the 68th precinct in June of 2010 as a detective.

25.    That upon information and belief Defendant **RAYMOND FERRARI** (hereinafter "**FERRARI**") was employed by **CITY** as a NYPD officer in June of 2010 as the Deputy Chief of DBB.

26.    That upon information and belief Defendant **JAIME ORTIZ** (hereinafter "**ORTIZ**") was employed by **CITY** as a NYPD officer in June of 2010 as a Lieutenant.

27.    That upon information and belief Defendant **DENNIS CHAN** (hereinafter "**CHAN**") was employed by **CITY** as a NYPD officer in June of 2010 as a Detective at MCS.

28.    That upon information and belief, defendants **JOHN DOE POLICE OFFICERS**

were and still are employed by the defendant **CITY** as agents of the **NYPD** whose names are unknown.

29.    That at all times hereinafter mentioned, defendant **ADMINISTRATION FOR CHILD SERVICES** (hereinafter "**ACS**") is authorized by New York State Law to investigate complaints of child abuse, maltreatment and neglect and to offer rehabilitative and preventive services to both children and parent.

30.    That at all times hereinafter Defendant **RONALD RICHTER** (hereinafter "**RICHTER**") is employed by defendant **CITY** as Commissioner of the Administration for Children's Services of the City of New York at the relevant times and is being sued in his individual and official capacities.

31.    That at all times hereinafter Defendant **JOHN MATTINGLY** (hereinafter "**MATTINGLY**") was employed by defendant **CITY** as Commissioner of the Administration for Children's Services of the City of New York at the relevant times and is being sued in his individual capacity.

32.    That as Commissioner, Defendant **RICHTER and MATTINGLY** are responsible for making and/or approving policies for ACS, including but not limited to regarding the investigation of alleged child abuse or maltreatment, removal and detention of children from their families, and the training and supervision of employees in ACS.

33.    That as ACS Commissioner, Defendant **RICHTER and MATTINGLY** are responsible for ACS's compliance with the Constitution, statutes, regulations, and common law of the United States and the State of New York.

34.    Upon information and belief, Defendant **JOHN WALKER** (hereinafter

6

"**WALKER**") was employed by ACS from June 2009 till the present as a Specialist.

35.    Upon information and belief, Defendant **THOMAS DUNBAR** (hereinafter "**WALKER**") was employed by ACS from June 2009 till the present as a Manager.

36.    Upon information and belief, Defendant **DUWAYNE BOYCE** (hereinafter "**BOYCE**") was employed by ACS from June 2009 till the present as a Specialist Supervisor.

37.    Upon information and belief, Defendant **CARLA LAWRENCE** (hereinafter "**LAWRENCE**") was employed by ACS from June 2010 till the present as a Director of Fields Operation.

38.    Upon information and belief, Defendant **HOWARD JOLSON** (hereinafter "**JOLSON**") was employed by ACS from June 2009 till the present as a Manager.

39.    Upon information and belief, Defendant **VILMA SMITH** (hereinafter "**SMITH**") was employed by ACS from June 2009 till the present as a Manager.

40.    Upon information and belief, Defendant **ADREA AVENT** (hereinafter "**AVENT**") was employed by ACS from September 2010 till the present as a Caseworker.

41.    That upon information and belief, defendants **JOHN DOE ACS AGENTS** were and still are employed by the defendant **CITY** as agents of defendant **ACS**.

## IV. FACTS

**PRIOR TO ARREST**

42.    That Ms. Saenz raised and cared for her son, F.J.S-R., from the date of his birth on October 5, 2008 and has been his primary caretaker and custodian until June 30, 2010, when ACS, with assistance of defendant police officers, unlawfully removed Plaintiff F.J.S-R from her care and custody.

43.     That on or about June 16, 2009 Plaintiff Saenz was awarded temporary custody of F.J.S-R. and a temporary order was also issued giving F.J.S.-R's  father (hereinafter "The Father") visitations for four hours a week.

44.     That by June 18, 2009 ACS was already involved in Plaintiff and The Father's Family Court proceeding, evidenced by the Court Ordered Inspection ("COI") ACS conducted, and that during said inspection Plaintiff Saenz reported her concerns to ACS that The Father was returning the child in poor health.

45**.**     That the COI itself was ordered by Henry James Joseph, Family Court Judge L. Krauss' Court Attorney, only against the mother.

46.     That on or about June 25, 2009 Plaintiff Saenz and the Father entered into a visitation stipulation whereby the Father would have visitation on Saturdays from 10 am to 2pm.

47.     That starting in or about the summer of 2009 to on or about February of 2011 and even beyond, The Father would return F.J.S-R from visits in poor condition, sometimes with red localized swelling to the child's anal area.

48.     That on or about September 1, 2009, Defendant ACS did observe the child undressed as part of an investigation into allegations from The Father against Plaintiff Saenz.

49.     That on or about September 10, 2009, ACS took naked photographs of the child in order to document his condition, including taking specific pictures of the child's private area.

50.     That thereafter, Plaintiff Saenz, at her attorney's advise, also began documenting the child's conditions by taking pictures of such things as his anal swelling, several of which were brought to ACS's attention.

51.     That on or about September 12, 2009 Ms. Karen Thompson, LMSW of Lutheran

8

Hospital observed the child in poor condition after being returned from a visit and that Ms. Thompson reported The Father to ACS.  Defendant ACS failed or neglected to investigate this complaint.

52.    That Dr. Fahad Kah, a pediatrician from Lutheran Hospital also became concerned and even suggested that the child's visits be suspended until an investigation was completed.

53.    That in or about December 24, 2009 The Father's visits were extended to Fridays at 5:30 pm to Saturdays at 6pm and that it was during these overnight visits that the mother first noticed the appearance of anal swelling and redness around the child's anal area.

54.    That following a December 2009 advice of her then attorney, on or about June 4, 2010, Plaintiff Saenz began to use money orders and/or newspapers to "timestamp" dates and times when her child was in good physical condition before visiting with The Father.

55.    That on or about June 5, 2010, immediately after the child was returned from a visit with the Father, Plaintiff reported the child's anal swelling to Dr. Shaikh Hasan, the child's pediatrician, who advised her to take the one year old child to the emergency room.   Plaintiff took pictures on this day of the anal swelling.

56.    That at Dr. Hassan's suggestion, Plaintiff took the child to Methodist Hospital and while there Dr. Fairbrother called Defendant ACS and reported the condition of the child to the Defendant Agency as against the Father.

57.    That on June 11, 2010, Plaintiff Saenz, armed with the before and after pictures of the child's condition, obtained an order from Judge Tanya Kennedy suspending The Father's visitations. Disturbed by the nature of what was depicted in the photographs, Judge Kennedy's order noted that the pictures "do not look like a diaper rash."

9

58.     That on or about June 15, 2010, at the advice of her counsel, Plaintiff Saenz went to the 72nd Precinct to report a possible molestation charge against The Father.

59.     That at the 72nd precinct, Plaintiff Saenz spoke with Defendant Ortiz and presented him with a copies of Judge Kennedy's aforementioned order, a letter from Dr. Hasan in which he noted that "may be, the child is being molested" and the same pictures she had presented to Judge Kennedy.

60.     That Detective Ortiz made copies of the items with which Plaintiff Saenz presented him but however, directed her to file her complaint with BCAC.

61.     That on June 16, 2010, Dr. Hasan called SCR and filed a complaint against the Father.

62.     That on or about June 16, 2010 Plaintiff Saenz went to the BCAC, believed to be a companion organization of defendant ACS, to file what she believed would be a criminal complaint against The Father.

63.     That while at BCAC, Plaintiff Saenz met with defendant Hawkins, tried to file a report with defendant Hawkins, but that Defendant Hawkins berated her and refused to file said report and told Saenz to await a phone call on a few weeks.  Also at BCAC was Defendant Dunbar who gave some ACS documents to Hawkins.

64.     That instead, Defendant Hawkins, without just cause, filed a report against Plaintiff Saenz with SCR (claiming neglect) and closed the potential case against the Father.

65.     That in addition, Defendant Hawkins called and threatened Dr. Hasan, a mandated reporter, with arrest if he should file any further complaints against the Father.

66.     That contrary to defendant Hawkins SCR complaint against Plaintiff Saenz for failing

10

to care for the child's condition, Dr. Melissa Dhundale had examined the child on the same day (June 15, 2010 ) and found that "there was no rash and the rest of the physical exam was with-in normal limits."

67.    That in a June 18, 2010 letter, Dr. Shaikh Hasan noted in regard to the condition of the child on June 5, 2010 that "in my 20 yrs of experience, I have never seen such inflammation and redness and swelling at the anal area with the diaper rash."

68.    That on or about June 18, 2010 Defendant Walker appeared at Plaintiff Saenz's residence with police escort from the 72nd precinct looking for Plaintiff Saenz.  On this date, Defendant Walker did tell Jaime, the superintendant at Plaintiff's residence, that the Plaintiff should have her attorney present when Walker returns to her home.  It is believed that Defendant Walker came to Saenz's home to remove the subject one year old child from her care without having just cause to do so.

69.    That on or about June 18, 2010 the child was examined by Dr. Hassan and the Doctor found no evidence of anal swelling.  Later that day, the child was dropped off to The Father for his visits.

70.    That on or about June 19, 2010 The Father did return the child at the 68th precinct to Plaintiff Saenz again with severe anal swelling and redness.  Officers at the 68th precinct refused on that day, to observe or record Plaintiff's complaint about the child's condition.

71.    That also on or about June 24, 2010 Plaintiff Saenz did call Nicole Clyne of the Department of Investigation ("DOI") and filed a complaint against Defendant Walker and Hawkins.

72.    That further on or about June 24, 2010, Defendant Walker and another unknown ACS worker came to Plaintiff Saenz's home, again with police escort from the 72nd precinct.  It is believed

that Walker came to Plaintiff's home for the sole purpose of removing her child from her custody without a Family Court order/warrant or justification to do so.  Upon information and belief, Walker had already contacted The Father and prepared The Father to take custody should Walker succeed in removing the child from Plaintiff's custody.

73.    That on or about June 25, 2010 Defendant John Walker was present at the drop-off / pick-up of the child between The Father and Plaintiff Saenz.  That upon information and belief, Defendant Walker accompanied the Father to Father's house, whereupon Walker  examined F.J.S-R's anal area (which included taking of pictures of the child) and found no evidence of anal rash at that time.

74.    That also on June 25, 2010, while still at Dr. Hasan's office and prior to the Father's pick-up of the infant plaintiff, Plaintiff Saenz took pictures of the child to document his healthy condition.

75.    That prior to seeing The Father on or about June 25, 2010, the child had been with the mother for an entire week.

76.    That on or about June 26, 2010 Plaintiff Saenz dropped off the June 25, 2010 pictures at a local Duane Reade pharmacy.

77.    That on or about June 29, 2010 Plaintiff Saenz did call the NYPD's Internal Affairs Bureau ("IAB") to file a complaint against Hawkins after she failed .

**THE ARREST**

78.    That upon information and belief, Defendants Nagrowski, Taylor, Spencer and other police officers whose names are currently unknown obtained copies of the photos Plaintiff left with Duane Reade.

79.     That upon information and belief, Defendants Bartolo, Ferrari, Chan, Failla, Nagrowski and other police officer defendants and unknown officers launched a City wide search for Plaintiff Saenz and Eli Samuel, based on a claim that Plaintiff Saenz and her son had been kidnapped.

80.     That upon information and belief, certain police officers, possible some of the already named defendant police officers, traced Plaintiff Saenz's phone number without a court order or warrant to do so.

81.     That upon information and belief, certain police officers, possible some of the already named defendant police officers, illegally traced Plaintiff Samuel's phone number without a court order or warrant to do so, in search of Plaintiff Saenz.

82.     That on or about June 30, 2010, in furtherance of the purported kidnapping probe, Defendant officers kicked down Plaintiff Saenz attorney's home door in search of Plaintiff and her son.  Plaintiff Saenz's attorney at the time was Farrel Donald (it is believed Donald's phone was also traced).

83.     That on or about June 30, 2010, in furtherance of the purported kidnapping probe, Defendant officers did arrest Defendant Samuel without probable cause to do so and then transported him to the 72nd precinct and did not allow him access to his attorney as he requested.

84.     That in the course of Samuel's arrest, Defendant police officers did assault Samuel and did unlawfully search his home and seize some of his belongings.

85.     That also on June 30, 2010 Defendants Taylor, Bartolo, Mazza, Karolkowski, Nagrowski and other defendant officers whose names are unknown did go Plaintiff Saenz's residence, purportedly in furtherance of the kidnapping investigation.

13

86.    That without consent to do so, Defendant Karolkowski did enter onto Plaintiff's residence, after preventing Plaintiff from closing the door to keep him out.

87.    That at Plaintiff's residence, said police officers informed Plaintiff Saenz that they believed Plaintiff Saenz and her son had been kidnapped and then ordered Plaintiff to come with them to the 72nd Precinct.

88.    That perplexed and alarmed at the thought that she was a victim of kidnapping and was then being compelled to go with officers to the precinct, Plaintiff Saenz called the 72nd precinct to verify the reason for the officers being at her home as well as the officers' identities.

89.    That Plaintiff Saenz spoke with a Captain Frazier of the 72nd precinct who advised Plaintiff that she could refuse to accompany the officers to the precinct.

90.    That Plaintiff Saenz then refused to go with the officers to the precinct and advised the officers that she and her son, who was with her at that time, had not been kidnapped and were not in danger.

91.    That at this point, Defendant Mazza threatened Plaintiff Saenz with the prospect of losing her son if Plaintiff Saenz refused to go with Defendant police officers to the precinct.

92.    That under the threat of losing her child, Plaintiff Saenz did accompany the police officers to the 72nd precinct.

93.    That Plaintiff herein alleges that the "kidnapping" investigation was simply a ruse to get Plaintiff to come with officers to the precinct in order to facilitate the unlawful removal of her son from her custody.  When Plaintiff resisted, she was threatened with the loss of her son's custody, which eventually happened anyway.  Plaintiff Saenz was accompanied by her roommate Isabel Romero to the precinct.

14

94.     That when Plaintiff Saenz, Romero and Plaintiff Samuel (who had arrived separately an hour earlier) arrived at the precinct, they all saw The Father, the Father's attorney and Plaintiff Saenz's mother at the precinct.

95.     That at the 72nd precinct, Plaintiffs were detained and questioned without the assistance of counsel.

96.     That The Father and Father's attorney were present at the precinct because it had already been pre-determined that the child would be paroled to The Father even before Plaintiff Samuel and Saenz were placed under arrest.

97.     That while at the precinct, Plaintiff Saenz and Samuel's attorney, the aforementioned Farrel Donald, did appear at the precinct demanding to see his client and that Defendant Nagrowski and Detective Spencer did prevent said attorney from speaking with his clients or learning anything about the reason for their arrest or the impending change in custody.  The aforementioned attorney was representing Plaintiff Saenz in the ongoing family court action at that time.

98.     That while at the precinct, Plaintiff Samuel and Saenz observed Defendant Officer(s) with a file bearing Saenz's name and contained papers that resembled Family Court documents.

99.     That Plaintiff Samuel observed one officer with a copy of an affidavit submitted in Family Court against Plaintiff Saenz as well as a picture of Samuel that must have been printed from Samuel's website.

100.     That also while at the precinct, Defendant officer(s) questioned Saenz about the Family Court proceeding and warned Saenz that she was not supposed to take pictures of her son.

101.     That Plaintiff Saenz explained to said police officer that she took the pictures in order to protect her son, as permitted under Social Services Law §416, and to document possible abuse of

15

her infant son.

102.    That Defendant officer(s) obtained all the aforementioned Family Court documents and information from Defendant ACS.

103.    That also on or about July 1, 2010 Plaintiff Saenz was placed under arrest and Samuel was for the first time told that he had been formally placed under arrest, both charged with endangering the welfare of a minor in connection with the taking of the aforementioned June 25, 2010 pictures.

104.    That it is alleged herein that officer Nagrowski or whichever officer initially determined that Plaintiffs endangered the welfare of a child did so in order to effectuate and assist in the illegal removal of the child the one year old minor from his mother's custody.

105.    That at no time did Defendant officer(s) have probable cause to arrest Plaintiff Samuel or Saenz and charge them with endangering the welfare of a minor.

106.    That upon information and belief Defendant Ortiz, to whom Plaintiff Saenz had previously presented the aforementioned June 5, 2010 pictures and Judge Kennedy's order, authorized Plaintiffs' arrest and/or detention for endangering the welfare of a child based on the taking on the June 25, 2010 pictures.

107.    That several hours after their arrest both Plaintiffs Samuel and Saenz were transported to the Red Hook Community Court, where she and Plaintiff Samuel were both charged with endangering the welfare of a child but were then released, never seeing a Judge, once District Attorney's office "Declined to Prosecute", citing that "defendants' actions are not criminal in nature."

108.    That at some point prior to Plaintiff's arrest, defendant **ACS** did conspire with the

16

defendant NYPD officers to remove the child from Plaintiff Saenz's custody and give the child to The Father. This allegation is supported by the "manhunt" for a kidnapping that never happened, and that soon after Plaintiff Saenz was located and detained, custody of her son was changed to the Father.

109.    That while at the precinct, officers refused to allow Plaintiff Saenz's roommate to take custody of the child. Rather, Ms. Romero was ordered to leave the child with police officers and to leave the precinct.

110.    That Defendant police officers ordered non-party Romero to leave the child with police officers in order to bring about the unlawful paroling of the child to The Father.

111.    That **ACS'** reasons for the alleged "emergency" removal of the child from the mother's custody is that "[m]other allowed child's diaper rash to continue more than 10 days without seeking medical attention. In addition, mother reportedly took naked pictures of child's rash and sought to accuse child's father of sex abuse."

112.    That to the contrary, just five days prior to June 30, 2010, as indicated above, John Walker himself took pictures of the child at Father's home and that Walker noted that the child was in good condition and exhibited no signs of a diaper rash.

113.    That likewise, Plaintiff Saenz also took pictures of the child at the Doctor's office, said pictures being the catalyst for the purported kidnapping investigation, in order to documents his good health on said date.

114.    That the above mentioned reason for the emergency removal was fabricated in order to facilitate the unlawful removal of the infant child from his mother.

115.    That on or about July 1, 2010, after the child was removed from the mother's custody,

17

said child was taken to Brooklyn Hospital for care. The Brooklyn Hospital Center records noted that ACS was closing the case and that the child was to be returned to the mother.

116.    That to date, the child has not been returned to the mother's care and custody.

117.    That also on July 1, 2010, ACS held a conference at which the infant Plaintiff was paroled to the Father's custody.

**AFTER THE ARREST / FAMILY COURT PROCEEDING**

118.    That in furtherance of the conspiracy to remove the child from Plaintiff Saenz's custody, Defendant **ACS** filed a neglect petition against the mother in Kings County Family Court on July 2, 2010.   The mother was never served with notice of the petition before the first court appearance.

119.    That as a result of the petition, Plaintiff Saenz has been allowed only supervised visits with the child.

120.    That at numerous supervised visits Defendant **ACS** would bring the child to the mother's visits in poor health, which at times would include exhibiting the same anal swelling complain of above.

121.    That since the child was removed from the mother's care, **ACS** and **ACS** individual defendants named herein continued to engage in acts that would further the conspiracy and alienate the child from his mother's care.

122.    That as an example, **ACS** had alleged that the mother was psychologically unstable and that said mental state formed the basis for removing the child from the mother's care.  When the court appointed psychologist found her to be stable and well able to care for her child, ACS refused to petition the court for the return of the child to the mother's care.  Rather, ACS demanded a second

evaluation.

123.    That **ACS** has failed to appear at more than 38 scheduled visitations between the mother and her child without good cause.  Said failures to appear for visits continue to date and harm the mother's ability to bond with her child.

124.    In another example, Defendant **AVENT** submitted a sworn affidavit in which she falsely claimed that Plaintiff Saenz assaulted her in the presence of the child when she said, "[t]he respondent then purposefully bumped into me as I was trying to speak with the nurse.  I filed a complaint with the hospital security, because I felt that she purposefully assaulted me."  Defendant Avent's claim resulted in the mother losing all visitations with her child for almost six months.

125.    That in connection with a Supreme Court Kings County Habeas Corpus petition, Plaintiff Saenz submitted the affidavit of Keita Aboubacar, the security guard who witnessed the alleged incident during which Plaintiff Saenz purportedly assaulted Defendant **AVENT**.  In his affidavit, Mr. Aboubacar disavowed Avent's claims of assault and added that ACS declined to even view the video footage that captured the entire incident.

126.    That it was only after the Mr. Aboubacar affidavit was submitted in the aforementioned Habeas Corpus petition that **ACS** agreed to resume Plaintiff Saenz's visits with her child. Plaintiffs allege here that the fact that the visits were reinstated simply because **ACS** said so, not because there was any finding that the mother had done nothing wrong, shows that the actions of the Family Court Judges is greatly affected by the direction in which **ACS** wishes to take the case.

127.    That on or about March 4, 2011, the following recorded exchange took place between

Defendant **WALKER** and Plaintiff Saenz:1

JW:   But they really have, I mean, it's no longer a thing that you was taking pictures, It's no longer a thing that you was endangering the baby.  So now it's like what else do they have, what other reasons do they have to keep you from your baby.

SS:   They don't have a reason.  **They're just trying to justify 'cause you know how the agency want to win.**

JW:   **I know.  I know the agency.  Right.  I know that and, and I'm part of the agency and they order me to do certain things but even still, even with, even with my agency ordering me to say certain things but they can't make me tell a lie.  To say some things to twist it this way. You got a good lawyer.  So he could defeat us.**

JW:   You know.  Hi.  Which was my original, uh, concern.  I was, I was concerned about that.  I was saying, well, how far is she gonna go.  You know.  **But now it's kinda, like, showing that you, you know you've been here, showing that you care for the baby, you know and, and you're not crazy and you ain't going to do nothing rash.  So why they holding, why they still keeping your baby?**  You know.

SS:   **They shouldn't keep the baby.**  That's-

JW:   **No they shouldn't!  They shouldn't.**So, I don't know.  I don't know.  So you go back to court March 14th?

JW:   Okay.  We, **you thought sex abuse.  I thought you was crazy <u>until</u> I saw it.**

SS:   **But now you know I'm not crazy.**

JW:   <u>**Right.  'Cause I, I mean that's, I mean for the rash, a di- a diaper rash to be in almost a perfect circle like that around his anus looks like sex abuse.**</u>

SS:   **That looks like sex abuse?**

JW:   <u>**It, it, it looks like it.**</u>

(emphasid added)

128.   That at no times after Walker's March 4, 2011 revelation that "they shouldn't keep the baby" did ACS make efforts to then return the child to Plaintiff Saenz.

129.   That more recently ACS cancelled visitation claiming that the infant Plaintiff was

---

1 JW = John Walker; SS = Shirley Saenz

suffering from asthma. The subject child had never suffered from asthma until the week when Plaintiff Saenz' visits were cancelled. It is believed visits were missed to cover-up the fact that the child continues to exhibit anal swelling.

130. That in furtherance of the conspiracy **ACS** has threatened persons who had information that would help the mother obtain custody of her child in Family Court.

131. That in furtherance of the conspiracy, **ACS** has or caused persons to suppress evidence or testimony that would be favorable to the Plaintiff mother in her efforts to obtain custody of her child in Family Court.

132. That Defendant **ACS**, by its agents named herein, engaged in a pattern of failing to maintain contemporaneous "field notebooks" during the period in question.

133. That Defendant **ACS**, by its agents named herein destroyed, altered, doctored, improperly duplicated or otherwise concealed records related to this incident alleged herein.

134. That ACS has engaged in a pattern of using police assistance to remove children from their parents' custody, without a court warrant/order, although the custodial parent was already challenging custody in court.

135. That defendant ACS engaged in a pattern of action designed to cover-up their unlawful policies.

136. That said pattern of action is prohibited by **ACS**' own rules and regulations.

137. That as a direct and proximate cause of all defendants' actions, Plaintiffs suffered injuries.

138. That the false arrest of the plaintiffs and plaintiffs' wrongful imprisonment, because of defendants' knowledge of a lack of any legitimate cause or justification, were intentional,

malicious, reckless and in bad faith.

139.    That as a direct and proximate results of defendants' actions, Plaintiff Saenz and F.J.S-R and Samuel suffered and continue to suffer, mental anguish, injury to reputation, psychological and emotional distress, some or all of which may be permanent.

140.    That as a direct and proximate result of defendants' actions, Plaintiffs were deprived of rights, privileges and immunities under the First, Fourth, Fifth, Sixth, Ninth, and Fourteenth Amendments to the United States Constitution and the laws of the City and State of New York.

141.    That Defendant **CITY**, as a matter of policy and practice, has with deliberate indifference failed to properly sanction or discipline police officers, including the defendants in this case, for violations of the constitutional rights of citizens, thereby causing police, including defendants in this case, to engage in unlawful conduct.

142.    That the actions of defendants, acting under color of State law, deprived Plaintiffs of their rights, privileges and immunities under the laws and Constitution of the United States, in particular, the rights to be secure in his person and property, to be free from the excessive use of force and from malicious prosecution, abuse of process and to due process.

143.    That by these actions, defendants have deprived the Plaintiffs of rights secured by the First, Fourth, Fifth, Sixth, Ninth and Fourteenth amendments to the United States Constitution, in violation of 42 U.S.C. Section 1983.

144.    That the defendants **CITY, RICHTER, MATTINGLY,KELLY and ACS**, by their agent officers involved in this did not have probable cause to approach the residence of the Plaintiffs.

145.    That the defendants **CITY, RICHTER, MATTINGLY, KELLY and ACS** by their agent officers involved in this incident did not have probable cause to search the person of the

22

Plaintiffs.

146.    That the defendants **CITY, RICHTER, MATTINGLY, KELLY and ACS** by their agent officers involved in this incident did not have probable cause to arrest Plaintiffs.

147.    That all actions by defendants **CITY, RICHTER, MATTINGLY, KELLY and ACS**, by their agents, were done under the color of state law.

148.    That the defendant **ACS** and **ACS** Commissioner by their agent officers involved in this incident did not have good reason remove the child from Plaintiff Saenz's custody.

149.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiffs sustained the damages hereinbefore stated.

150.    That by reason of the foregoing, Plaintiffs demand judgment for violation of their constitutional rights as under 42 U.S.C. Section 1983 against all Defendants in the amount of seventeen million ($17,000,000) dollars.


## V. FIRST CAUSE OF ACTION: 1983 CLAIM

151.    Plaintiff re-alleges, reiterates and repeats each and every allegation contained in the above paragraphs with the same force and effect as if more fully and at length set forth in each of the subsequent causes of action.

152.    Upon information and belief, defendants **CITY, RICHTER, MATTINGLY and KELLY** have a policy of removing and detaining, without an order/warrant, children from custodial parents who are otherwise engaged in an ongoing custody proceeding in Family Court,

by use of police assistance, without due process of law, and based upon constitutionally inadequate investigations.

153.    By detaining and imprisoning the plaintiffs, without probable cause or reasonable suspicion, defendants deprived the plaintiffs of their rights, remedies, privileges and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. Section 1983, including, but not limited to, rights guaranteed by the First (Association), Fourth (unreasonable search and seizure), Fifth (due process), Sixth (right to counsel), Ninth (custodial interference), and Fourteenth (due process), Amendments of the United States Constitution.

154.    In addition, the defendant officers conspired among themselves to deprive the plaintiff of his constitutional rights secured by 42 U.S.C. Section 1983, and the First (Association), Fourth (unreasonable search and seizure), Fifth (due process), Sixth (right to counsel), Ninth (custodial interference), and Fourteenth (due process), Amendments of the United States Constitution, and took numerous overt steps in furtherance of such conspiracy as set forth above.

155.    The Defendant Officers and ACS employees acted under pretense and color of state law and in their individual and official capacities and within the scope of their respective employment by defendants **CITY and KELLY**, **RICHTER and MATTINGLY**.   Said acts by the Defendant Officers were beyond the scope of their jurisdiction, without authority of law and in abuse of their powers, and said Defendants acted willfully, knowingly and with the specific intent to deprive plaintiff Saenz, infant Plaintiff and Samuel of their constitutional rights secured by 42 U.S.C. Section 1983 and by the the First (Association), Fourth (unreasonable search and seizure), Fifth (due process), Sixth (right to counsel), Ninth (custodial interference), and

24

Fourteenth (due process), Amendments of the United States Constitution.

156.     Acting pursuant to said policy, and without probable cause or due process of law, and based upon a constitutionally inadequate investigation, defendants **MAZZA, KAROLOWSKI, NAGROWSKI, BARTOLA, HAWKINS, TAYLOR, BARTOLDUS, FAILLA, KELLEY, SPENCER, ORTIZ, CALABRO, FERRAI, CHAN, ACS, WALKER, DUNBAR, BOYCE, LAWRENCE,  JOLSON, SMITH** and **AVENT** removed or conspired to remove infant plaintiff from plaintiff Saenz's custody and care.

157.     Acting pursuant to said policy, and without probable cause or due process of law, and based upon a constitutionally inadequate investigation, defendants **MAZZA, KAROLOWSKI, NAGROWSKI, BARTOLA, HAWKINS, TAYLOR, BARTOLDUS, FAILLA, KELLEY, SPENCER, ORTIZ, CALABRO, FERRAI, CHAN, ACS, WALKER, DUNBAR, BOYCE, LAWRENCE,  JOLSON, SMITH and AVENT** conspired/assisted in the detention of all Plaintiffs.

158.     Acting pursuant to said policy, and without probable cause or due process of law, and based on a constitutionally inadequate investigation, defendants **WALKER, DUNBAR, BOYCE, LAWRENCE,  JOLSON, SMITH and AVENT** detained the infant plaintiff in government custody and interfered with Plaintiff Saenz's custodial rights by instituting and maintaining the Family Court action against  Plaintiff Saenz**.**

159.     Said policy, and the removal and detention effectuated pursuant to said policy, constituted an unlawful interference with plaintiff's liberty interest in the care and custody of her children, the infant plaintiffs herein, in violation of the First and Fourteenth Amendments to the

United States Constitution. Said policy, and its implementation, were gross deviations from acceptable professional conduct.

160.    Said policy and its implementation, constituted unlawful interference with infant plaintiffs' liberty interest in being cared for by his mother.

161.    In the alternative, defendants **CITY, RICHTER, MATTINGLY and KELLY** failed to adopt policies requiring their employees to remove children only if probable cause existed for such a removal and only if they provide due process of law to children and parents, and only if they had investigated to determine probable cause, and only if there is a court order/warrant to do so in cases when custody is being challenged. Defendants' agents and employees acted to remove and detain the infant child without probable cause and without due process of law, in violation of First (Association), Fourth (unreasonable search and seizure), Sixth (right to counsel), Ninth (custodial interference), and Fourteenth (due process), Amendments of the United States Constitution.

162.    Defendants **CITY, RICHTER, MATTINGLY and KELLY** knew or should have known that their failure to adopt a policy requiring their employees to afford parents and children due process of law in connection with the removal of the children would cause defendants' agents and employees to remove and detain children without due process of law, in violation of Fourth (unreasonable search and seizure), Sixth (right to counsel), Ninth (custodial interference), and Fourteenth (due process), Amendments of the United States Constitution.

163.    Defendants **CITY, RICHTER, MATTINGLY and KELLY** knew or should have known that their failure to adopt a policy regarding the removal of the children from their parents, especially in cases where there is an already ongoing Family Court custody challenge, would cause defendants' agents and employees to violate children's and parents' rights to live together as a family without state intervention, contrary to the First (association), Fourth (unreasonable search and seizure), Sixth (right to counsel), Ninth (custodial interference), and Fourteenth (due process), Amendments of the United States Constitution.

164.    Defendants further violated the civil rights of the plaintiffs by conspiring to cover up the nature and reason for the unlawful arrest, imprisonment, detention of plaintiffs and the unlawful commencement of the Family Court proceeding.

165.    That Defendants' actions were not privileged and immune.

166.    As a result of defendants' actions, plaintiff Saenz suffered the loss of freedom and of the custody and services of her children, the infant suffered the loss of liberty and of the care and guidance of their mother, and all plaintiffs suffered extreme humiliation, pain and suffering, terror, mental anguish, and depression.

## VI. SECOND CAUSE OF ACTION

167.    Plaintiffs re-alleges, reiterates and repeats each and every allegation contained in the above paragraphs with the same force and effect as if more fully and at length set forth in each of the subsequent causes of action.

168.    That said incident and the injuries resulting therefrom were caused solely by the

27

negligence, carelessness and recklessness or intentional and willful acts of Defendants **CITY, ACS and RICHTER and MATTINGLY**, through its agents, servants, employees, and defendants ACS workers, by the persistence of the aforementioned policy of removing children from custodial parents that are already challenging custody in Family Court.

169.    Defendants **CITY, ACS and RICHTER and MATTINGLY** provided grossly inadequate and unprofessional training and supervision to their agents and employees, especially the defendant ACS supervisors, regarding:

a. investigating child abuse and/or neglect cases involving custodial parents who, as an exercise of Social Services Law §416 et. seq, document by photographic evidence, the nature of an alleged sexual abuse;

b. determining whether probable cause exists to remove or detain children of custodial parents who, as an exercise of Social Services Law §416 et. seq, document by photographic evidence, the nature of an alleged sexual abuse;

c. determining whether probable cause exists to remove or detain children, with the assistance of police officers, from custodial parents who are otherwise already engaged in an ongoing custody proceeding in family court;

d. the provision of notice and an opportunity to be heard prior to, or immediately after, the removal of children;

e. the obtaining of arrest warrants in Family Court, especially where there is an already ongoing case, before a Family Court judge; and

f. the proper maintenance of field notebooks documenting ACS work

170.    Defendants **CITY, ACS and RICHTER and MATTINGLY** knew or should have known that their employees were improperly trained and supervised in said issues.

171.    Defendants **CITY, ACS and RICHTER** and **MATTINGLY** knew or should have known that their employees would confront said issues in their work and that, without training, would make the wrong decisions on said issues.

172.    The defendants **CITY, ACS and RICHTER and MATTINGLY**, through their agents, servants, employees and the defendants ACS workers/supervisors involved, were negligent, reckless and careless in the exercise of their powers against Plaintiffs.

173.    The defendants, **CITY, ACS and RICHTER and MATTINGLY** were further negligent in failing to properly investigate the aforesaid unlawful paroling of the infant plaintiff, and failing to timely question those individual defendants involved.

174.    By reason of their lack of training, defendants **WALKER, DUNBAR, BOYCE, LAWRENCE, JOLSON, SMITH** and **AVENT**, improperly removed or conspired to remove the infant plaintiff from the custody of plaintiff.

175.    By reason of their lack of training, **defendants WALKER, DUNBAR, BOYCE, LAWRENCE,  JOLSON, SMITH and AVENT** detained infant plaintiff from plaintiff  Saenz without adequate notice to plaintiff, without adequate investigation and without probable cause and without due process of law.

176. By reason of their lack of training, defendants **WALKER, DUNBAR, BOYCE, LAWRENCE, JOLSON, SMITH and AVENT** commenced and continued a negligence action against Plaintiff Saenz without good reason to do so.

177. As a result of the defendants' actions, plaintiff Saenz suffered the loss of freedom and of the custody and services of her child; the infant plaintiff suffered the loss of liberty and of the care and guidance of his mother; and plaintiffs Saenz and infant plaintiff suffered extreme humiliation, pain and suffering, terror, mental anguish, and depression.

## VII. THIRD CAUSE OF ACTION

178. Plaintiff re-alleges, reiterates and repeats each and every allegation contained in the above paragraphs with the same force and effect as if more fully and at length set forth in each of the subsequent causes of action.

179. That said incident and the injuries resulting therefrom were caused solely by the negligence, carelessness and recklessness of Defendants **CITY and KELLY**, through its agents, servants, employees and the police officers involved, both directly and vicariously.

180. That such negligence consisted of negligence in training, hiring, supervision and retention of the police officers/detectives involved in this incident; in failing to observe the existing police department protocols for police officers/detectives designed to govern the exercise of their arrest powers, causing the injuries both physical and emotional resulting out of the arrest of plaintiffs by defendant officers, depriving Plaintiffs of their civil rights, privileges and immunities secured under the State of New York Constitution; failing to use care in the

30

performance of police duties as reasonably prudent and careful police officers would have used in similar circumstances; in failing to train in removal of children from custody of their parents; in hiring and retaining persons who were unfit to serve as police officers/detectives; failing to properly investigate their background; in failing to train and instruct police officers/detectives, especially regarding the abuse of power while in the field; in failing to give police officers/detectives proper instructions when confronted with the type of issues and circumstance detailed above;

181.    Defendants **CITY and KELLY** knew or should have known that their employees were improperly trained and supervised in said issues.

182.    Defendants **CITY and KELLY** knew or should have known that their employees would confront said issues in their work and that, without training, would make the wrong decisions on said issues.

183.    The defendants **CITY and KELLY**, through their agents, servants, employees and the police officers involved, were negligent, reckless and careless in the exercise of their powers against Plaintiffs.

184.    The defendants, **CITY and KELLY** were further negligent in failing to properly investigate the aforesaid unlawful arrest and imprisonment plaintiffs Saenz and Samuel, and failing to timely question those individual defendants involved.

185.    By reason of their lack of training, defendants **MAZZA, KAROLOWSKI, NAGROWSKI, BARTOLA, HAWKINS, TAYLOR, BARTOLDUS, FAILLA, KELLEY,**

**SPENCER, ORTIZ, FERRAI, CHAN and CALABRO** unlawfully arrested/imprisoned or conspired to unlawfully arrest/imprison plaintiffs Saenz and Samuel.

186.    As a result of the defendants' actions, plaintiff Saenz suffered the loss of freedom and of the custody and services of her child; plaintiff Samuel suffered the loss of freedom; infant plaintiff suffered the loss of liberty and of the care and guidance of his mother; and plaintiffs Saenz and Samuel suffered extreme humiliation, pain and suffering, terror, mental anguish, and depression.

## VIII. FOURTH CAUSE OF ACTION

187.    Plaintiff re-alleges, reiterates and repeats each and every allegation contained in the above paragraphs with the same force and effect as if more fully and at length set forth in each of the subsequent causes of action.

188.    The Defendants **CITY, KELLY** and Defendant Officers caused the Plaintiff Saenz and Samuel to be wrongfully and illegally arrested, imprisoned and be prosecuted.

189.    The wrongful arrest, imprisonment and prosecution of the Plaintiff was carried out without Plaintiff Saenz and Samuel's consent, and without probable cause or reasonable suspicion.

190.    At all relevant times, the Defendants acted forcibly in apprehending, detaining and imprisoning the Plaintiffs.

191.    During this period, the Plaintiffs were unlawfully and wrongfully harassed, detained, prosecuted and threatened.

192.    Throughout this period, the Plaintiffs were unlawfully, wrongfully, and unjustifiably

detained, deprived of their liberty, and imprisoned.

193.    All of the foregoing occurred without any fault or provocation on the part of the Plaintiffs.

194.    That Defendant **ACS** employees conspired with, aided or acted in concert with Defendant Officers to effectuate/facilitate the false arrest and false imprisonment of Plaintiffs Saenz and Samuel by divulging to Defendant officers information about Plaintiffs that would cause Plaintiff's false arrest and imprisonment and by preparing and aiding in the parole of the infant child to The Father.

195.    That Defendant ACS employees knew or should have known that divulging said information would have led to Plaintiff Saenz and Samuel's arrest and imprisonment.

196.    Defendants, their officers, agents, servants, and employees were responsible for Plaintiffs' detention and imprisonment during this period of time.  Defendant **CITY** and defendant **KELLY**, **ACS and RICHTER**, as employer of the Defendants, are responsible for their wrongdoing under the doctrine of **respondeat superior**.

197.    The Defendants Officers acted with a knowing, willful, wanton, grossly reckless, unlawful, unreasonable, unconscionable, and flagrant disregard of the Plaintiffs' rights, privileges, welfare, and well-being and are guilty of egregious and gross misconduct toward Plaintiffs

198.    As a result of the defendants' actions, plaintiff suffered the loss of freedom and of the custody and services of her child; loss of her liberty; the infant plaintiff suffered the loss the care and guidance of his mother; Plaintiff Samuel suffered the loss of his liberty; and all plaintiffs suffered extreme humiliation, pain and suffering, terror, mental anguish, and depression.

## IX. FIFTH CAUSE OF ACTION

199.    Plaintiff re-alleges, reiterates and repeats each and every allegation contained in the above paragraphs with the same force and effect as if more fully and at length set forth in each of the subsequent causes of action.

200.    That at all times, Defendant **AVENT** was an employee of Defendant ACS.

201.    That in a sworn affidavit, Defendant **AVENT** did aver that "[t]he respondent then purposefully bumped into me as I was trying to speak with the nurse.  I filed a complaint with the hospital security, because I felt that she purposefully assaulted me."

202.    That at all times the allegations that Plaintiff Saenz, the 'respondent' referred to in the statement, "purposely bumped into me" or "assaulted me" was false.

203.    That Defendant **AVENT** knew or should have known at the time of making the statement that it was false.

203.    That the statement was made to one or more third person.

204.    That Defendant knew at the time of making the statement that it would, and it did, result in the loss of Plaintiff Saenz's visitations for six months with her then two year old infant son.

205.    That the statement were made willfully and with malice intent, designed to cause Plaintiff Saenz to lose her visits with her then two year old son.

206.    That as a result of the defamatory statement, Plaintiff Saenz suffered the loss the companionship and services of her child; the infant plaintiff suffered the loss the care and guidance of his mother; Plaintiff Saenz suffered extreme humiliation, pain and suffering, terror, mental anguish, and depression.

## X. SIXTH CAUSE OF ACTION

207.    Plaintiff re-alleges, reiterates and repeats each and every allegation contained in the above paragraphs with the same force and effect as if more fully and at length set forth in each of the subsequent causes of action.

208.    The Defendant **AVENT** engaged in extreme and outrageous conduct intentionally and recklessly causing severe emotional distress to plaintiff Saenz.

209.    Plaintiff Saenz's emotional distress has damaged her personal and professional life because of the severe mental pain and anguish which were inflicted through deliberate and malicious actions of Defendant who submitted a false statement that she knew will result in the loss of Plaintiff Saenz's visitations with her son.

210.    Defendant **CITY**, **RICHTER AND ACS**, their officers, agents servants, and employees were responsible for the intentional infliction of emotional distress suffered by the Plaintiff at the hands of the Defendant **AVEN**T.   Defendant **CITY** as employer of is responsible for her wrongdoing under the doctrine of **respondeat superior**.

211.    As a direct and proximate result of the misconduct and abuse of authority detailed above, plaintiff sustained the damages hereinbefore stated.

212.    That by reason of the foregoing, Plaintiff demands judgment for intentional infliction of emotional distress against Defendants **CITY**, **RICHTER, ACS** and **AVENT** in a sum to be determined at trial.

## XI. SIXTH CAUSE OF ACTION

213.    Plaintiffs re-allege each of the proceeding paragraphs as though fully set forth in

each of the subsequent causes of action.

214.    That defendants owed a duty of care to act toward Plaintiffs Saenz and Samuel and with the highest degree of care to infant Plaintiff.

215.    That Defendants' detention of plaintiffs, the removal of infant Plaintiff from his mother's care under the facts alleged herein and the prosecution of the family court case constituted gross breaches of said duty from accepted professional standards.

216.    As a result of the defendants' actions, plaintiff suffered the loss of freedom and of the custody and services of her child; loss of her liberty; the infant plaintiff suffered the loss the care and guidance of his mother; Plaintiff Samuel suffered the loss of his liberty; and all plaintiffs suffered extreme humiliation, pain and suffering, terror, mental anguish, and depression.

## DEMAND FOR TRIAL BY JURY

217.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, the plaintiff respectfully request judgment against the Defendants as follows:

A.      On the First Cause of Action, for a declaratory judgment declaring the policy/and/or practices of removing children from the custodial parents based on the fact that the custodial parent is documenting instances of alleged abuse as unconstitutional, declaring the policy/and/or practices of using police assistance to remove children from the custody of their parents without a Family Court warrant as unconstitutional; enjoining defendants from removing

children from the custodial parent where the charge against the custodial parent is the exercise of Social Services Law §416; enjoining defendants from the use of police assistance in removing children from the custodial parent without a Family Court warrant or order to do so; ordering defendants to provide training to their agents and employees the claims raised in the first cause of action; awarding compensatory damages to plaintiffs in an amount to be determined by the jury; and for punitive damages;

B.      On the Second Cause of Action awarding compensatory damages to plaintiffs in an amount to be determined by the jury; and for punitive damages;

C.      On the Third Cause of Action, awarding compensatory damages to plaintiffs in an amount to be determined by the jury; and for punitive damages;

D.      On the Fourth Cause of Action awarding compensatory damages to plaintiffs in an amount to be determined by the jury; and for punitive damages;

E.      On the Fifth Cause of Action awarding compensatory damages to plaintiffs in an amount to be determined by the jury; and for punitive damages;

F.      On the Sixth Cause of Action awarding compensatory damages to plaintiffs in an amount to be determined by the jury; and for punitive damages;

G.      For an award of reasonable attorney's fees and costs under 42 U.S.C. Section 1988;

H.      Granting such other and further relief as this Court may deem necessary in the interest of justice.

Dated: Brooklyn, New York
       January 5, 2011

                         Yours, etc.,

                         **/S/**
                         **Mustapha Ndanusa (MN-0687)**
                         26 Court Street, Suite 603
                         Brooklyn, New York 11242
                         (718) 825-7719
                         mndanusa@gmail.com